UNITED STATES COURT OF APPEALS
EIGHTH CIRCUIT

No. 15-2792

RONALD C. TUSSEY, CHARLES E. FISHER, TIMOTHY PINNELL,

*Plaintiffs-Appellants*,

v.

ABB INC.; JOHN W. CUTLER, JR.; PENSION REVIEW COMMITTEE OF
ABB INC.; PENSION & THRIFT MANAGEMENT GROUP OF ABB INC.;
EMPLOYEE BENEFITS COMMITTEE OF ABB INC.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Missouri
No. 2:06-cv-04305-NKL
Hon. Nanette K. Laughrey

**BRIEF OF DEFENDANTS-APPELLEES**

BRYAN CAVE LLP
Thomas E. Wack
Jeffrey S. Russell
Elizabeth C. Carver
211 North Broadway
St. Louis, Missouri  63102
(314) 259-2000

*Attorneys for Defendants-Appellees*

## SUMMARY OF THE CASE

This case is nearly ten years old. It was tried over sixteen days in 2010 and subsequently appealed. In reversing and remanding on the claim at issue here, this Court spelled out the proper measure of damages for the district court. Because plaintiffs could prove no damages under that standard, they made no attempt on remand to do so. In fact, they wrote off this Court's directive as "dicta" and instead submitted to the district court a stew of damage computations based upon a hypothetical product their expert created in hindsight. The district court complied with this Court's directive, finding that plaintiffs had sustained no damages under that governing standard.

Plaintiffs now ask this Court to order the district court to start all over, to allow further discovery, to hear additional evidence, and then to enter another damage award based upon their expert's latest concoction. That, of course, would provide the grist for yet a third appeal. But the law-of-the-case doctrine and its close relation, the mandate rule, are grounded on principles of finality that bar this attempt. Plaintiffs have provided no basis for this Court to take the extraordinary step of reversing one of its own rulings in the same case when there has been no change in the facts or the law. The two grounds they assert for doing so—clear error and "dicta"—are groundless. In these circumstances, oral argument should not exceed fifteen minutes per side.

Appellate Case: 15-2792    Page: 2    Date Filed: 12/11/2015 Entry ID: 4345711

## CORPORATE DISCLOSURE STATEMENT

Defendant ABB Inc. is an indirect subsidiary of ABB Ltd. Shares of ABB Ltd. are traded on the Swiss and Stockholm Stock Exchanges. American Depository Shares of ABB Ltd. are traded on the New York Stock Exchange. ABB Inc. has no subsidiaries or affiliates that have offered shares to the public. The only consolidated subsidiary in the ABB Group with listed shares is ABB Limited, Bangalore, India, which is listed on the Bombay Stock Exchange and the National Stock Exchange of India.

Appellate Case: 15-2792    Page: 3    Date Filed: 12/11/2015 Entry ID: 4345711

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ................................................................. i

CORPORATE DISCLOSURE STATEMENT ................................. ii

TABLE OF CONTENTS .............................................................. iii

TABLE OF AUTHORITIES .......................................................... vi

JURISDICTIONAL STATEMENT ................................................ 1

STATEMENT OF THE ISSUES .................................................... 2

STATEMENT OF THE CASE ....................................................... 4

    1.    Nature of The ABB Plan ................................................ 4

    2.    The Pleadings, Arguments and Briefing ...................... 5

    3.    Statement of Facts Adduced At Trial .......................... 6

        (a)    Elimination Of Wellington .............................. 6

            (i)    Elimination In Connection With A Plan Design Change ................................. 6

            (ii)    Underperformance ............................... 9

            (iii)    Ability To Create Balanced Portfolios Without Wellington ......................... 10

            (iv)    Plaintiffs' Position ............................ 11

        (b)    Selection Of The Freedom Family ................ 11

        (c)    Mapping ........................................................ 14

    4.    Prior Judgment And Appeal ....................................... 14

Appellate Case: 15-2792     Page: 4     Date Filed: 12/11/2015 Entry ID: 4345711

5.   Plaintiffs' Petitions For Rehearing And For Certiorari .......................16

6.   Proceedings On Remand .................................................................17

7.   Decision On Remand .....................................................................18

SUMMARY OF THE ARGUMENT ...................................................................20

ARGUMENT .................................................................................................25

       Standard Of Review ...................................................................25

A.   This Court's Damages Formulation Is Binding Under The Law-Of-The-Case Doctrine And The Mandate Rule.................................26

1.   Law Of The Case ...............................................................27

2.   Mandate Rule ....................................................................29

B.   This Court's Ruling On The Proper Measure Of Damages Is Not Subject To Any Exception For "Dicta" ...........................................29

C.   This Court's Ruling On The Proper Measure Of Damages Was Not Clearly Erroneous And Does Not Result In Any Manifest Injustice..................................................................................34

1.   "Clearly Erroneous".........................................................35

(a)   *Bierwirth* ...........................................................35

(b)   Elimination of Wellington ....................................39

(i)   Difference in Products............................39

(ii)   Plan-Design Change ..............................40

(iii)   Lack of Precedent..................................41

(iv)   "Several" Managed Allocation Funds Requirement .......................................42

| | | | |
|---|---|---|---|
| (c) | Addition of The Freedom Family | ........................................ | 42 |
| | (i) | Law Of The Case, Again | ......................................... | 42 |
| | (ii) | Failure to Cross-Appeal | ......................................... | 43 |
| | (iii) | Plan Design Change | ......................................... | 44 |
| | (iv) | The Freedom Family As "Several Managed Allocation Funds" | ........................................ | 44 |
| | (v) | No Better Alternative | ......................................... | 44 |
| (d) | Mapping | ........................................................................ | 45 |
| 2. | "Manifest Injustice" | ........................................................... | 48 |

D. Alternatively, The Judgment Below Should Be Affirmed Because The ABB Defendants Are Not Liable On The Investment Selection/Mapping Claim .................................. 49

(a) Ignoring Key Facts And Mischaracterizing Others ........ 51

(b) Inferring Unlawful Intent ............................................ 53

E. The District Court Did Not Abuse Its Discretion By Resolving The Issue Of Damages On Remand Based Upon The Existing Record ...................................................................................... 60

CONCLUSION ...................................................................................................... 62

CERTIFICATE OF COMPLIANCE .................................................................... 63

CERTIFICATE OF SERVICE .............................................................................. 64

Appellate Case: 15-2792     Page: 6     Date Filed: 12/11/2015 Entry ID: 4345711

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Reid*,
  14 App. D.C. 54 (1899) ................................................................. 2, 32

*Arabian Agric. Servs. Co. v. Chief Indus., Inc.*,
  309 F.3d 479 (8th Cir. 2002) .............................................................. 54

*Arch Ins. Co. v. Precision Stone, Inc.*,
  584 F.3d 33 (2d Cir. 2009) ................................................................ 25

*Arizona v. California*,
  460 U.S. 605 (1983).......................................................................... 27

*Arkansas Game & Fish Comm'n v. United States*,
  133 S.Ct. 511 (2012)........................................................................ 33

*Atwater v. NFL Players Ass'n*,
  2009 U.S. Dist. LEXIS 98236 (N.D. Ga. Mar. 26, 2009) .................... 37

*Bethea v. Levi Strauss & Co.*,
  916 F.2d 453 (8th Cir. 1990) ..................................................... 2, 29, 34

*Bidwell v. University Med. Ctr., Inc.*,
  685 F.3d 613 (6th Cir. 2012) ......................................................... 2, 47

*Brazzell v. United States*,
  788 F.2d 1352 (8th Cir. 1986) ........................................................... 31

*Brieger v. Tellabs, Inc.*,
  629 F.Supp.2d 848 (N.D. Ill. 2009) ................................................... 54

*Brown v. Astrue*,
  597 F.Supp.2d 691 (N.D. Tex. 2009) ................................................. 34

*Brown v. Lanyon Zinc Co.*,
  179 F. 309 (8th Cir. 1910) ................................................................ 28

Appellate Case: 15-2792    Page: 7    Date Filed: 12/11/2015 Entry ID: 4345711

*Cohens v. Virginia*,
   19 U.S. (6 Wheat.) 264 (1821) ................................................................ 2, 31, 32

*Cox v. Mid-Am. Dairymen, Inc.*,
   965 F.2d 569 (8th Cir. 1992) ................................................................ 26

*Donaho v. FMC Corp.*,
   74 F.3d 894 (8th Cir. 1996) ................................................................ 51

*Donovan v. Bierwirth*,
   754 F.2d 1049 (2d Cir. 1985) ................................................................ 20, 35, 36

*Duncan Energy Co. v. U.S. Forest Serv.*,
   109 F.3d 497 (8th Cir. 1997) ................................................................ 29

*Dytrt v. Mountain State Tel. & Tel. Co.*,
   921 F.2d 889 (9th Cir. 1990) ................................................................ 45

*Eastman v. First Data Corp.*,
   292 F.R.D. 181 (D.N.J. 2013) ................................................................ 37

*Fletcher-Merrit v. NorAm Energy Corp.*,
   250 F.3d 1174 (8th Cir. 2001) ................................................................ 51

*Galli v. New Jersey Meadowlands Comm'n*,
   490 F.3d 265 (3d Cir. 2007) ................................................................ 34

*Gallus v. Ameriprise Fin., Inc.*,
   497 F.Supp.2d 974 (D. Minn. 2007) ................................................................ 37

*George v. Kraft Foods Global, Inc.*,
   800 F.Supp.2d 928 (N.D. Ill. 2011) ................................................................ 37

*Hankins v. Standard Ins. Co.*,
   677 F.3d 830 (8th Cir. 2012) ................................................................ 26

*Harker v. United States (In re Harker)*,
   357 F.3d 846 (8th Cir. 2004) ................................................................ 3, 60

Appellate Case: 15-2792   Page: 8   Date Filed: 12/11/2015 Entry ID: 4345711

*Hayes v. Invesco, Inc.*,
  907 F.2d 853 (8th Cir. 1990) ............................................................... 25

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ................................................... 2, 40, 55

*Houghton v. McDonnell Douglas Corp.*,
  627 F.2d 858 (8th Cir. 1980) ............................................................... 27

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999)............................................................. 2, 40, 41, 44

*In re MidAmerican Energy Co.*,
  286 F.3d 483 (8th Cir. 2002) ............................................................... 43

*Jennings v. Stephens*,
  –U.S.–, 135 S.Ct. 793 (2015) ............................................................... 49

*Johnson v. Wells Fargo Bank, N.A.*,
  744 F.3d 539 (8th Cir. 2014) ............................................................... 49

*Jones & Laughlin Steel Corp. v. Pfeifer*,
  462 U.S. 523 (1983)......................................................................... 3, 60

*Kansas Pub. Emps. Ret. Sys. v. Blackwell, Sanders, Matheny, Weary &
  Lombardi, L.C.*,
  114 F.3d 679 (8th Cir. 1997) ............................................................... 28

*Kennedy v. Georgia-Pacific Corp.*,
  31 F.3d 606 (8th Cir. 1994) ............................................................... 26

*Kenseth v. Dean Health Plan, Inc.*,
  722 F.3d 869 (7th Cir. 2013) ............................................................... 43

*Kirschbaum v. Reliant Energy, Inc.*,
  526 F.3d 243 (5th Cir. 2008)............................................................... 44

*Leimkuehler v. American United Life Ins. Co.*,
  713 F.3d 905 (7th Cir. 2013) ................................................... 3, 55, 56

-viii-

*Leister v. Dovetail, Inc.*,
   546 F.3d 875 (7th Cir. 2008) ............................................................. 38

*Level 3 Commc'ns, L.L.C. v. City of St. Louis*,
   540 F.3d 794 (8th Cir. 2008) ......................................................... 3, 61

*Libel v. Adventure Lands of Am., Inc.*,
   482 F.3d 1028 (8th Cir. 2007) ........................................................... 54

*Liberty Mut. Ins. Co. v. Elgin Warehouse & Equip.*,
   4 F.3d 567 (8th Cir. 1993) ................................................................. 28

*Little Earth of United Tribes, Inc. v. U.S. Dep't of Housing & Urban Dev.*,
   807 F.2d 1433 (8th Cir. 1986) ................................................. 2, 27, 29

*Lockheed Corp. v. Spink*,
   517 U.S. 882 (1996) .............................................................. 40, 41, 44

*Macheca Transport Co. v. Philadelphia Indem. Ins. Co.*,
   737 F.3d 1188 (8th Cir. 2013) ................................................. 2, 27, 28

*Maxfield v. Cintas Corp.*,
   487 F.3d 1132 (8th Cir. 2007) ..................................................... 2, 28

*Metropolitan Life Ins. Co. v. Glenn*,
   554 U.S. 105 (2008) ................................................................ 3, 51, 52

*Molasky v. C.I.R.*,
   997 F.2d 1241 (8th Cir. 1993) ......................................................... 60

*Morris v. American Nat'l Can Corp.*,
   988 F.2d 50 (8th Cir. 1993) ............................................................. 38

*Nitsche v. CEO of Osage Valley Elec. Coop.*,
   446 F.3d 841 (8th Cir. 2006) ........................................................... 43

*Okruhlik v. University of Ark.*,
   395 F.3d 872 (8th Cir. 2005) ........................................................... 26

Appellate Case: 15-2792    Page: 10    Date Filed: 12/11/2015 Entry ID: 4345711

*Passmore v. Astrue,*
  533 F.3d 658 (8th Cir. 2008) ................................................................ 33

*Ray Haluch Gravel Co. v. Central Pension Fund of Int'l Union of*
  *Operating Eng'rs & Participating Emp'rs,*
  –U.S.–, 134 S.Ct. 773 (2014) ................................................................ 1

*Rexam Beverage Can Co. v. Bolger,*
  620 F.3d 718 (7th Cir. 2010) ................................................................ 25

*Robinson v. Norris,*
  60 F.3d 457 (8th Cir. 1995) .................................................................. 32

*S.B.L. ex rel. T.B. v. Evans,*
  80 F.3d 307 (8th Cir. 1996) .................................................................. 33

*Scheerer v. Hardee's Food Sys., Inc.,*
  148 F.3d 1036 (8th Cir. 1998) .......................................................... 2, 29

*Speed v. Transamerica Corp.,*
  135 F.Supp. 176 (D. Del. 1955) ............................................................ 33

*Thornton v. Carter,*
  109 F.2d 316 (8th Cir. 1940) ................................................................ 27

*Tibble v. Edison Int'l,*
  639 F.Supp.2d 1074 (C.D. Cal. 2009) .................................................... 37

*Tussey v. ABB Inc.,*
  746 F.3d 327 (8th Cir. 2014) ........................................................ *passim*

*UniGroup, Inc. v. Winokur,*
  45 F.3d 1208 (8th Cir. 1995) ................................................................ 33

*United Fire & Cas. Ins. Co. v. Garvey,*
  419 F.3d 743 (8th Cir. 2005) ................................................................ 25

*United States v. Bartsh,*
  69 F.3d 864 (8th Cir. 1995) .............................................................. 2, 29

Appellate Case: 15-2792    Page: 11    Date Filed: 12/11/2015 Entry ID: 4345711

*United States v. Bates*,
  614 F.3d 490 (8th Cir. 2010) ............................................................ 61

*United States v. Bloate*,
  655 F.3d 750 (8th Cir. 2011) ............................................................ 32

*United States v. Castellanos*,
  608 F.3d 1010 (8th Cir. 2010) ..................................................... 60, 61

*United States v. Cote*,
  51 F.3d 178 (9th Cir. 1995) .............................................................. 34

*United States v. English*,
  329 F.3d 615 (8th Cir. 2003) ......................................................... 3, 49

*United States v. Lunsford*,
  725 F.3d 859 (8th Cir. 2013) ...................................................... 32, 33

*United States v. Sanchez*,
  35 F.3d 673 (2d Cir. 1994) ..................................................... 2, 31, 33

*United States v. Walterman*,
  408 F.3d 1084 (8th Cir. 2005) ......................................................... 29

*Universal Camera Corp. v. N.L.R.B.*,
  340 U.S. 474 (1951) ...................................................................... 3, 52

*Wakkinen v. UNUM Life Ins. Co. of Am.*,
  531 F.3d 575 (8th Cir. 2008) ........................................................... 51

*Waldoch v. Medtronic, Inc.*,
  757 F.3d 822 (8th Cir. 2014) ........................................................... 52

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*,
  946 F.2d 1003 (2d Cir. 1991) .......................................................... 25

Appellate Case: 15-2792    Page: 12    Date Filed: 12/11/2015 Entry ID: 4345711

# STATUTES, RULES AND OTHER

26 U.S.C. §72(t)(1) ........................................................................... 46

29 U.S.C. §1103 ............................................................................... 46

29 U.S.C. §1104(c)(5) ...................................................................... 46

29 U.S.C. §1113(1) ........................................................................... 48

29 C.F.R. 2550.404c-5(b)(1) ............................................................ 46

Fed. R. Civ. P. 15(c)(1) .................................................................... 48

Default Investment Alternatives Under Participant Directed Individual
  Account Plans,
  72 F.R. 60452 (Oct. 24, 2007) ...................................................... 46

Dana M. Muir, *Revenue Sharing in 401(k) Plans: Employers As Monitors?*,
  20 Conn. Ins. L.J. 485 (2014) ....................................................... 55

William F. Sharpe, *Asset Allocation:  Management Style and Performance
  Measurement*, 18 J. Portfolio Mgmt. 7 (Winter 1992) ...................... 39

Appellate Case: 15-2792     Page: 13     Date Filed: 12/11/2015 Entry ID: 4345711

# JURISDICTIONAL STATEMENT

Plaintiffs incorrectly state that "[t]he district court entered final judgment disposing of all parties' claims on remand on July 9, 2015" (Pl. Br. 1). The district court decided their motion for attorneys' fees only two days ago, and it is not a subject of this appeal. But in view of *Ray Haluch Gravel Co. v. Central Pension Fund of Int'l Union of Operating Engineers & Participating Employers*, –U.S.–, 134 S.Ct. 773 (2014), it appears that the petition for fees does not affect the finality of the district court's July 9, 2015 order.

Appellate Case: 15-2792     Page: 14     Date Filed: 12/11/2015 Entry ID: 4345711

## STATEMENT OF THE ISSUES

1. Whether this Court's measure of damages on the prior appeal was subject to the law-of-the-case doctrine, the prior panel rule, and/or the mandate rule.

> *Little Earth of United Tribes, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 807 F.2d 1433 (8th Cir. 1986);
>
> *Bethea v. Levi Strauss & Co.*, 916 F.2d 453 (8th Cir. 1990);
>
> *Macheca Transport Co. v. Philadelphia Indem. Ins. Co.*, 737 F.3d 1188 (8th Cir. 2013);
>
> *Maxfield v. Cintas Corp.*, 487 F.3d 1132 (8th Cir. 2007).

2. Whether this Court's measure of damages on the prior appeal can and should be disregarded as dicta.

> *Scheerer v. Hardee's Food Sys., Inc.*, 148 F.3d 1036 (8th Cir. 1998);
>
> *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264 (1821);
>
> *United States v. Sanchez*, 35 F.3d 673 (2d Cir. 1994);
>
> *Anderson v. Reid*, 14 App. D.C. 54 (1899).

3. Whether this Court's measure of damages on the prior appeal can and should be disregarded as clearly erroneous and a manifest injustice.

> *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999);
>
> *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009);
>
> *Bidwell v. University Med. Ctr., Inc.*, 685 F.3d 613 (6th Cir. 2012);
>
> *United States v. Bartsh*, 69 F.3d 864 (8th Cir. 1995).

Appellate Case: 15-2792    Page: 15    Date Filed: 12/11/2015 Entry ID: 4345711

4.   Alternatively, whether the district court's judgment on remand can and should be affirmed because defendants are not liable on the investment selection/mapping claim.

   *United States v. English*, 329 F.3d 615 (8th Cir. 2003);

   *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008);

   *Leimkuehler v. American United Life Ins. Co.*, 713 F.3d 905 (7th Cir. 2013);

   *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474 (1951).

5.   Whether the district court abused its discretion in refusing to reopen the record for additional evidence on remand.

   *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983);

   *Harker v. United States (In re Harker)*, 357 F.3d 846 (8th Cir. 2004);

   *Level 3 Commc'ns, L.L.C. v. City of St. Louis*, 540 F.3d 794 (8th Cir. 2008).

Appellate Case: 15-2792     Page: 16     Date Filed: 12/11/2015 Entry ID: 4345711

## STATEMENT OF THE CASE

### 1.    Nature of The ABB Plan

The PRISM (for ABB salaried employees) and a smaller Represented PRISM (for its hourly employees) are defined contribution plans under §401(k) of the Internal Revenue Code.   The two Plans (collectively "the Plan") are functionally identical, differing only with respect to participant eligibility.   In a 401(k) defined-contribution plan, participants are responsible for deciding how to allocate the assets in their individual accounts among the various options offered by the Plan.   All investment decisions are made individually by the participants themselves.

Participation in the Plan is voluntary.   Each participant decides whether or not to contribute to the Plan, which options to invest in, whether and when to change options, and how much to invest in those options.   If the employee invests, ABB makes certain matching contributions to the employee's account. Participants bear the risk of investment losses in their plan account and reap the benefit of investment gains.   At retirement, participants are entitled to the value of the invested assets in their individual accounts.   The value of each individual account depends on the amounts invested and the investment performance net of fees.

-4-

## 2. The Pleadings, Arguments and Briefing

Neither plaintiffs' 124-paragraph complaint (Defendants' Appendix Volume 1 ["DA1"] at 1-36) nor their 107-paragraph amended complaint (DA1:64-98) make any mention of the Vanguard Wellington Fund ("Wellington"), the Fidelity family of Freedom Funds ("the Freedom family"), or the mapping of participant assets from any investment option to another.  Plaintiffs' first mention of the Freedom family appeared in the report of their expert, Mr. Steve Pomerantz, submitted nearly two years after the filing of this action (Defendants' Confidential Appendix ["DCA"] at 252).  Pomerantz contended at trial that the Freedom family was inappropriate as a Plan investment option (Tr.8:1812-13, 1819-21; 9:1975), but plaintiffs offered no evidence concerning whether, why, or how the removal of Wellington or the mapping of assets was improper.

Plaintiffs did not mention Wellington, the Freedom family, or mapping in their class certification motion or in their trial brief (DA1:37-63, 153-73).  They were silent about those matters in their pre-trial statement of factual and legal issues (DA1:122-52).  Plaintiffs' 154-paragraph post-trial proposed findings and conclusions mentioned the mapping of Wellington assets into the Freedom family in only a single paragraph (DA1:181-82).  In his opening statement, plaintiffs' counsel said nothing about either Wellington or mapping (Tr.1:28-56).  He mentioned the Freedom family only as an example of excessive fees (Tr.1:52).  He

Appellate Case: 15-2792     Page: 18     Date Filed: 12/11/2015 Entry ID: 4345711

made no mention of Wellington, the Freedom family, or mapping in his closing (Tr.16:3734-72).  Evidence of those subjects within the 3,859-page trial transcript was intermittent and sparse.[1]

### 3.  Statement of Facts Adduced At Trial

**(a)  Elimination Of Wellington**

At the time it made its decision, ABB had three reasons for the elimination of Wellington as a Plan investment option: (i) its de-selection was in connection with a plan design change; (ii) it had underperformed against its Plan benchmark; and (iii) participants could construct their own balanced funds from other plan investment options without investing in Wellington.

**(i)  Elimination In Connection With A Plan Design Change.**

The Plan's Investment Policy Statement ("IPS") was designed "to provide plan participants with a range of investment options that spanned the risk-return spectrum."  *Tussey v. ABB Inc.*, 746 F.3d 327, 331 (8th Cir. 2014).  To accomplish that goal, ABB redesigned the Plan in 2000 to provide a three-tier structure, consisting of managed allocation funds, passively-managed funds and actively-managed funds (Tr.11:2478-79; Plaintiffs' Appendix Volume III ["PAIII"] at 754-55).

---

[1]    *See*  Tr.4:895-918;  5:1040-47;  5:1060-64;  5:1142-43;  5:1158-66;  8:1809-25; 8:1849-58; 8:1877; 9:1954-55; 9:1970-76; 9:2031-39; 9:2045-48; 10:2280-87; 10:2386-92; 11:2676-83; 11:2689-93; 12:2762-64; 13:2965-67; 13:3017-22.

Appellate Case: 15-2792     Page: 19     Date Filed: 12/11/2015 Entry ID: 4345711

The IPS described the Tier 1 managed allocation fund strategy as follows: "For participants unwilling or unable to make a personal asset allocation decision, the Plan will offer several 'managed allocation' funds designed to offer the participant a professionally managed, well diversified fund or funds appropriate for the participants' investment goals" (PAIII:759; Tr.5:1040). Tier 2 was designed for "participants who wish to establish and maintain their own asset allocation (or modify one or more of the above 'managed allocation' options) without active management risk" (PAIII:759). Tier 3 was for "participants who wish to take on active management risk and the associated potential for higher return" (PAIII:760). As a result of the Plan's redesign in 2000, the Plan's line-up expanded from ten to twenty-three investment options (DA4:774). Investment options were to "be selected from publicly available mutual funds or their institutional equivalents" (PAIII:592).

Wellington was a static balanced mutual fund (Tr.9:1971; 12:2762-63). A balanced fund combines a stock component and a bond component within a single portfolio. A static balanced fund maintains a fixed allocation of stocks and bonds, reflecting a predetermined level of risk that can range from moderate (with a higher equity component) to conservative (with a higher fixed-income component). Static balanced funds do not tailor the mix of assets for individual investors. They do not change their asset allocation over time or make different asset allocations

Appellate Case: 15-2792     Page: 20     Date Filed: 12/11/2015 Entry ID: 4345711

available for participants of different ages or different risk preferences (Tr.10:2391; 12:2763-64).

By contrast, the Freedom family was a group of dynamic managed allocation funds, often referred to as "target-date funds" ("TDFs"). TDFs are designed for participants who want a more conservative portfolio as they grow nearer to retirement but who are unable or unwilling to make the investment decisions to accomplish that goal themselves—"novice investors who are seeking one stop shopping and/or are intimidated by the asset allocation process" (Tr.3:565-66; 5:1002-03; 10:2387-88; PAIII:750). The asset allocation of a TDF is thus automatically re-balanced to decrease the participants' risk exposure over time (746 F.3d at 331; Tr.3:565-66; 4:896). A professional manager creates the asset allocation instead of the participant (Tr.10:2386). The automatic change in asset allocation is referred to as the "glide path" (Tr.5:1046). Plaintiffs acknowledge that TDFs have different returns depending on their glide path (PAIII:237). Wellington, by contrast, has no glide path. Its allocation between debt and equity remains nearly constant.

When ABB decided to add the Freedom family as a Plan option in November 2000, TDFs were a relatively new innovation (Tr.4:897-98; 8:1974; PAII:331, 337). At the ABB Pension Review Committee ("PRC") meeting that month, defendant John Cutler stated that the search had focused on dynamic funds

Appellate Case: 15-2792    Page: 21    Date Filed: 12/11/2015 Entry ID: 4345711

"because they do not require a participant to reevaluate his/her decision over time"
(PAIII:754). The decision to offer the Freedom family, as a dynamic set of funds
with automatic asset resets over time, made the static Wellington unnecessary and
"moot" (Tr.12:2763-64). On March 31, 2001, ABB instructed the Plan's trustee to
"liquidate all participant balances held in the Vanguard Wellington Fund" and to
invest "the proceeds in the appropriate Freedom Fund." The trust amendment
containing that instruction stated on its face that, in doing so, ABB was acting as
Plan sponsor (DA3:642; DA4:781).

### (ii) Underperformance

At its May 2000 meeting, the PRC discussed the elimination of Wellington
as a Plan option (PAIII:750). The IPS, adopted at that same meeting, stated that
the performance of any Plan investment option should be measured as follows:
"[e]ach investment manager's portfolio will be evaluated against a relevant market
benchmark selected by PTM [an ABB working group]" in collaboration with the
investment manager (PAIII:593). Because there can be different benchmarks for
the performance of the same product, the benchmarking choice can affect the
evaluation of a fund's performance. By virtue of the IPS directive, ABB's choice
of benchmark became the governing standard of performance. In representing to
this Court that Wellington's performance was "stellar," however, Pomerantz

Appellate Case: 15-2792    Page: 22    Date Filed: 12/11/2015 Entry ID: 4345711

borrowed his benchmark from Morningstar rather than applying ABB's own benchmark (Tr.9:1973-74).

ABB concluded that the benchmark for the performance of Wellington should be a composite of an equity return and a fixed-income return because that was how Wellington itself was constructed (Tr.5:1161). ABB used a benchmark for Wellington described as "(60% S&P/40% LB Agg)"—a balance of 60% equities and 40% fixed income, the equity element being measured by the return of the Standard & Poors 500 Index Fund and the fixed-income element by the return of Lehman Brothers Aggregate Bond Index. (DA4:768; Tr.11:2703-04). In the year 2000, Wellington's performance fell below this benchmark: (1) the three-year return for Wellington was an 8.9% return but 9.9% for its benchmark; (2) the five-year return for Wellington was 13.1% but 13.6% for the benchmark. *Id*. Further, ABB offered to prove on remand that, as of September 30, 2000, Wellington was underperforming its benchmark over one-year, three-year, and five-year periods (DA2:447-48). ABB also knew that participants were voting with their feet by pulling money out of Wellington. During the year 2000, participant cash inflows to Wellington declined and were exceeded by its cash outflows (DA4:771).

**(iii) Ability To Create Balanced Portfolios Without Wellington.**

As stated at the May 23, 2000 PRC meeting, the de-selection of Wellington would not restrict the participants' ability to create their own balanced portfolio

-10-

from the Plan's other investment options (PAIII:750). Pomerantz agreed that participants could have effectively re-created their Wellington investment by spreading their money across different Plan options (Tr.8:1857-58). At the time of this meeting, the PRC had not yet decided to offer the Freedom family or any other dynamic managed allocation fund. The decision to offer the Freedom family was not made until the PRC's November 2000 meeting (PAIII:754).

### (iv) Plaintiffs' Position

Pomerantz testified at trial that there was nothing improper in ABB's removal of Wellington as a Plan option: "[T]hey could have eliminated Wellington. . . . I don't object to taking something out of the plan and putting something into the plan" . . . . "There's many things. They could basically have decided we don't want Wellington anymore for whatever reasons" (Tr.9:1972-73). That was consistent with his deposition testimony (DCA:191). There was no fiduciary duty to maintain Wellington as an option (DCA:201-02).

### (b) Selection Of The Freedom Family

At the November 2000 PRC meeting, Mr. Cutler reviewed the funds that had been considered in connection with the Plan design change (PAIII:754). He recommended and the PRC chose the Freedom family to populate Tier 1 (Tr.5:1044; PAIII:754). The Freedom family consisted of five mutual funds with ten-year increments (2000, 2010, 2020, 2030 and 2040) corresponding to a

Appellate Case: 15-2792    Page: 24    Date Filed: 12/11/2015 Entry ID: 4345711

participant's closest potential retirement date (PAIII:754). For example, a participant expecting to retire in 2010 would select the Freedom 2010 Fund. Mr. Cutler favored the Freedom family because of its glide path (746 F.3d at 331; Tr.5:1046).

The trial record reveals only one fund, the BGI Fund, as a possible alternative to the Freedom family at the time that family of funds was selected. But the district court found that the BGI Fund was rejected because it was a static fund (PAI:112; PAII:331 n.6).[2/] Pomerantz testified that the dynamic T. Rowe Price Fund did not yet exist at the time of the managed allocation fund decision in 2000 (Tr.8:1822, 1825). Plaintiffs agreed (PAI:212). There is no evidence in the trial record of any dynamic fund alternative to the Freedom family available as a "managed allocation" option when Freedom was selected.

The IPS did not require a five-year performance history in order for a fund to be eligible for selection. The only reference to time periods is within the IPS section headed "Criteria for Monitoring, Evaluating and De-Selecting Investment Options," stating that "[f]und performance will be evaluated over rolling three and five year time periods" (PAIII:593). Before selecting the Freedom family, the

---

[2/]     Cutler's recollection, cited by the district court for its conclusion that BGI was a static fund, was incorrect. Subsequent expert research reveals that BGI was the manager of four dynamic fund families under a single master trust (DA2:447). But that error is immaterial because the Freedom family outperformed these BGI offerings by $9.3 million during the period for which plaintiffs seek damages (DA2:448).

Appellate Case: 15-2792     Page: 25     Date Filed: 12/11/2015 Entry ID: 4345711

PRC did review its performance factors, including information ratios, Morningstar ratings, reputation, management stability, and investment managers (Tr.5:1163).

ABB took a variety of actions that were contrary to Fidelity's interests. In 2004, ABB also removed the Fidelity Magellan Fund, Fidelity's leading moneymaker in the Plan, from the Plan platform (Tr.5:1125-26; 6:1246; DA3:682; DA4:895). ABB thereafter rejected Fidelity's demand for an $11 per participant fee per year as compensation for its lost revenue following the removal of Magellan (Tr.3:580; 4:818-19; 10:2238-39; 15:3517-18, 3527-28). ABB removed the Fidelity Retirement Money Market Fund and the Fidelity U.S. Equity Index Pool from the platform (Tr.5:1110; PAIII:754; DA3:775). Mr. Cutler recommended the removal of the Fidelity Money Market Fund at the same time that he sought the removal of Wellington (PAIII:750). ABB replaced the Fidelity US Equity Index with BGI, a non-Fidelity entity (PAIII:754). ABB also mapped assets out of Fidelity funds, not just into them. In 2001 ABB mapped participant assets out of two eliminated Fidelity funds and into non-Fidelity funds (DA4:763). Even though the Plan's assets and average participant account balance grew during the relevant period, Fidelity's compensation from the Plan decreased by more than half (DA4:776; Tr.6:1271-72; 7:1527-28).

Appellate Case: 15-2792   Page: 26   Date Filed: 12/11/2015 Entry ID: 4345711

**(c)    Mapping**

"Mapping" involves the automatic transfer of assets from one fund into another investable product (DA1:181-82).  It is a default option that occurs only when a participant in an eliminated fund fails to select a replacement fund (Tr.2:353; 5:1062-63; 11:2681; 13:3019).  In connection with the Plan redesign in 2000, the PRC discussed the need to provide default options for participants who failed to select a replacement for eliminated funds (PAIII:750, 754).

Any participant whose assets were mapped was free to select another Plan option (Tr.1:170-71).  The Plan specifically allowed participants to direct their contributions to "any or all of the funds specified" on the Plan platform, and it provided that "[a] Participant may . . . change his designated investment formats for his prospective contributions at any time" (DA3:533, 608).

ABB elected to map the participants' Wellington assets into the Freedom family because both were balanced funds (Tr.5:1063-64).  Indeed, after the de-selection of Wellington, the Freedom family constituted the only balanced funds on the platform (Tr.5:1063; DA3:652).

### 4.    Prior Judgment And Appeal

On March 31, 2012, the district court entered judgment against ABB in the amount of $21.8 million on the investment selection/mapping claim (PAI:153, 158).  The court decided that ABB had included the Freedom family as an

-14-

investment option without sufficient analysis of available alternatives and to drive more revenue to Fidelity (PAI:112-13, 114-15, 118-19, 122-23). It emphasized that the Freedom family was "in existence for fewer than five years" when it was added as a Plan option (PAI:112). It found that, in May 2005, ABB learned that Fidelity had charged higher fees to the Plan in order to make up for its reduced fees under corporate plans (PAI:134-35). To support its $21.8 million damage award, the court fully adopted Pomerantz's calculation of the difference in performance between Wellington and the Freedom family through 2007 (PAI:152-53; Tr.8:1849).

On appeal, ABB challenged the district court's liability findings and its adoption of the Pomerantz measure of damages. In its Opening Brief, ABB specifically argued that a different measure of damages was required:

> "[I]f mapping into Freedom was the breach, then Pomerantz applied the wrong measure of damages. The correct measure would be the difference between the performance of Freedom (the actual world) to the performance of the fund to which Wellington *should* have been mapped (the 'but for' world)." (DA2:286) (emphasis in original).

This Court vacated the judgment on the investment selection/mapping claim and remanded "for further proceedings consistent with this opinion." 746 F.3d at 341. This Court summarized the facts it deemed relevant to the investment selection/mapping issue, and directed the district court to review the issue as of the

-15-

time the relevant decisions were made rather than in hindsight and to afford deference to the discretion owed to the ABB fiduciaries. *Id*. at 331-32, 338.

This Court expressly ruled that "the $21.8 million damage award for the participants' mapping claim is speculative and exceeds the 'losses to the plan resulting from' any fiduciary breach." *Id* at 339. In rejecting the damages formulation presented by Pomerantz and adopted by the district court, this Court concluded:

> "In light of the IPS requirement to add a managed allocation fund, it seems the participants' mapping damages, if any, would be more accurately measured by comparing the difference between the performance of the Freedom Funds and the minimum return of the subset of managed allocated funds the ABB fiduciaries could have chosen without breaching their fiduciary obligations."

*Id*. at 339.

### 5. Plaintiffs' Petitions For Rehearing And For Certiorari

In their April 16, 2014 Petition for En Banc or Panel Rehearing (DA2:428-29), plaintiffs argued that this Court erred by failing to consider the performance of Wellington in its ruling on damages:

> "The panel overlooked this in suggesting a different damages methodology on remand. . . . The panel based its suggestion on 'the IPS requirement to add a managed allocation fund.' While a prudent fiduciary may have chosen to provide a managed allocation fund, that decision did not compel removal of Wellington. . . . Thus, the performance of Wellington is properly considered in determining the magnitude of the Plan's lost investment opportunity 'resulting from' the breach of duty in removing Wellington."

Appellate Case: 15-2792     Page: 29     Date Filed: 12/11/2015 Entry ID: 4345711

On May 20, 2014, this Court ruled that "[t]he petitions for rehearing en banc are denied. The petitions for rehearing by the panel are also denied." (DA2:434-36). On June 10, 2014, this Court's mandate was issued to the district court (DA2:437). In their subsequent unsuccessful petition for a writ of certiorari to the U.S. Supreme Court, plaintiffs only argued a Circuit split on the judicial standard for review of fiduciary decisions, not on the measure of damages (DA5:896-933).

### 6.    Proceedings On Remand

On remand, both sides requested that the district court permit additional evidence. Plaintiffs asked the court to re-open the record on damages but not on liability (PAI:159-65). ABB made an offer of proof to show that: (1) Pomerantz used the wrong benchmark to measure Wellington's performance; (2) Wellington had been underperforming prior to its de-selection; (3) static and dynamic funds are different products that cannot properly be compared for purposes of calculating damages; (4) ABB did consider the only available managed allocation alternative before choosing the Freedom family; and (5) the Freedom family had been outperforming and had lower fees than the only managed allocation alternative at the time of its selection (DA2:447-48).

In their proposed findings and conclusions on remand, plaintiffs devoted sixty-one pages to damages (PAI:239-99). For the first time, they contended that the removal of Wellington and the addition of the Freedom family were separate

Appellate Case: 15-2792     Page: 30     Date Filed: 12/11/2015 Entry ID: 4345711

wrongs requiring two damage awards (PAI:231). Plaintiffs submitted to the district court seventy-three different charts and tables utilizing different data sources and time periods to support their damage calculations (PAI:243-98; PAII:305-11; DA2:452-499).

Plaintiffs calculated damages from the elimination of Wellington as the difference in performance between the mapped assets from that fund and that of the Freedom family (PAI:236). That was the same measure of damages this Court had already rejected and set aside. 746 F.3d at 338-39. Plaintiffs' alleged damages from the addition of the Freedom family were based upon its returns relative to a hypothetical "customized" target-date fund that Pomerantz had fashioned on remand out of other existing Plan options (PAI:236-38; PAII:300-02). Despite this Court's pronouncement that the prior damage award was "speculative" and "exceeds" plan losses (746 F.3d at 339), plaintiffs sought an increase of up to $44,904,700 in damages based upon the removal of Wellington and as much as $56,225,271 more from the addition of the Freedom family (PAII:297-98).

### 7.    Decision On Remand

In its July 9, 2015 order on remand, the district court denied each party's request for additional evidence "because this matter was not remanded by the Eighth Circuit for a new trial; it was remanded for further consideration" (PAII:324-25). It rejected plaintiffs' effort to expand the record to include its new

-18-

ways of calculating damages because they could have been but were not presented at trial. It stated that "[i]t does not promote the principle of finality to permit a party to develop a new strategy on remand or to conduct additional discovery to address concerns raised by prior rulings of the courts" (PAII:326).

The district court largely repeated its liability findings against ABB in connection with the investment selection/mapping decisions (PAII:326-45). This time, however, the court concluded that the selection of the Freedom family, while conflicted, was not imprudent (PAII:341). Despite its renewed findings of liability, the court entered judgment in favor of ABB because plaintiffs had failed to prove damages in accordance with the methodology this Court established (PAII:346). The district court pointed out that plaintiffs had not even sought discovery directed to proving damages under that method (PAII:326). While the order on remand stated that neither side presented evidence consistent with this Court's methodology (PAII:326), ABB's offer of proof did so (DA2:448). The district court also noted that plaintiffs had failed to prove damages under the alternative methodology they themselves had advocated, i.e., measured by the performance of the alternative TDF that had the highest rate of return (PAII:346).

Appellate Case: 15-2792    Page: 32    Date Filed: 12/11/2015 Entry ID: 4345711

## SUMMARY OF ARGUMENT

In rejecting the bewildering array of calculations plaintiffs submitted in their 73 damage tables, the district court properly concluded that it was bound by this Court's method of determining damages. That measure of damages was the law of the case, a doctrine predicated upon the need for finality. It was also binding because the mandate to the district court required that further proceedings be "consistent with this opinion."

This Court's stated measure of damages was not dicta. ABB specifically argued the proper measure of damages in its brief on appeal, but plaintiffs did not bother to respond in theirs. This Court followed ABB's suggested formulation. The measure of damages was based upon the specific facts of this case and was not suggested as a rule for unrelated litigation. It was defined in detail and was not a stray remark. It was an alternative holding rather than dicta. Even if it were dicta, the district court had every right to follow it as persuasive authority.

Far from being clearly erroneous, this Court's measure of damages was entirely correct. This Court's formulation is the inevitable consequence of the factual differences between *Donovan v. Bierwirth* and this case and does not create a "circuit split." It was proper for this Court to conclude that damages could not be measured by the difference in performance between Wellington and the Freedom family. Wellington was static in nature; its allocation of debt and equity did not

-20-

automatically change over time. The Freedom family consisted of a series of dynamic TDFs in which the allocation grew more conservative by gliding away from stocks and toward bonds as the participant grew nearer to retirement. Wellington and the Freedom family were different products that were *intended* to perform differently. Since their difference in performance was inherent, a comparison of the two could not form the basis for determining damages.

Because ABB removed Wellington as part of a plan design change (a non-fiduciary, settlor decision), its elimination could not be grounds for liability or damages. There is no ERISA precedent for finding the removal of a single fund from a multi-fund Plan to be a breach of fiduciary duty under ERISA. Investors in an eliminated fund are not deprived of their assets and, because of the fundamental principle of participant choice that governs all 401(k) plans, can invest those assets in any other plan option—or invest in the eliminated option outside the Plan. Moreover, Wellington did not qualify as the "several managed allocation funds" required by the IPS.

Plaintiffs failed on the first appeal to raise the addition of the Freedom family as a basis for liability, and that claim is now barred as the law of the case. Plaintiffs' proposed damage award here, based upon the relative performance of the Freedom family and a hypothetical product created by their expert, is barred for the same reason. Plaintiffs' hypothetical fund is a separate account rather than a

Appellate Case: 15-2792   Page: 34   Date Filed: 12/11/2015 Entry ID: 4345711

mutual fund. The district court had already ruled that ABB had no duty to include more separate accounts in the plan, and plaintiffs are bound by that decision because they failed to cross-appeal from it. Like the elimination of Wellington, the addition of the Freedom family was a non-fiduciary plan design decision. The Freedom family constituted the "several managed allocation funds" required by the IPS. Plaintiffs presented no evidence of any managed allocation alternative that ABB could have chosen at the time it selected the Freedom family.

Mapping participant assets from Wellington after its elimination from the Plan was proper. Indeed, it was necessary to map rather than to distribute those assets to the participants because ERISA requires that the assets remain in trust, and distribution of the participants' Wellington assets would have had adverse tax consequences to them. Mapping into a "qualified default investment alternative" like the Freedom family is expressly sanctioned by statute and regulation. Participants were free to avoid mapping of their assets into the Freedom default option simply by electing to invest them in another option. Any attempt to fabricate a claim based on mapping ignores participant choice. And there is no "manifest injustice" to plaintiffs in enforcing the law-of-the-case principle because its application works against ABB as well.

Because plaintiffs could not prove any damages under this Court's methodology, they simply ignored it. Instead, on remand they contended for the

Appellate Case: 15-2792     Page: 35     Date Filed: 12/11/2015 Entry ID: 4345711

first time that the removal of Wellington and the addition of the Freedom family were independent wrongs that should be added together for a higher damage award than the amount this Court found excessive. The district court entered judgment against plaintiffs because they failed to prove any damages under this Court's methodology.

In renewing its liability findings, the district court purported to adopt the abuse-of-discretion standard for judicial review of fiduciary decisions, but it actually afforded no deference to ABB at all. Its breach-of-loyalty findings were based on fundamental misunderstandings of the differences between Wellington and the Freedom family and the process for selecting prudent investment options. Even though a conflict-of-interest analysis requires consideration of the entire record rather than a myopic focus upon isolated facts, the court ignored all of the substantial direct evidence demonstrating that, far from favoring Fidelity, ABB took repeated actions adverse to Fidelity's interests. In the face of this direct evidence, the court relied on "circumstantial evidence" that was really mere conjecture. The court inferred bad motives that are irreconcilable with the required deferential standard of judicial review over fiduciary decisions. Its conflict-of-interest findings are wrong because they confuse the effect of the investment selection/mapping decisions with its purpose.

Appellate Case: 15-2792    Page: 36    Date Filed: 12/11/2015 Entry ID: 4345711

The underlying facts do not support the district court's theory of an ABB/Fidelity conspiracy. The revenue sharing method of recordkeeping compensation that Fidelity received is both common and legal. ABB's reluctance to seek revenue sharing rebates from Fidelity was based upon a realistic concern that this vendor would compensate for such lost revenues by imposing other charges on the Plan. The "circumstantial evidence" relied on by the district court permitted no inference of unlawful intent.

ABB had no motive to favor Fidelity. The district court thought that ABB wanted a comfortable relationship with Fidelity because of the corporate benefit it received from Fidelity's "cross-subsidization." But Fidelity did not even disclose its practice to ABB until 2005, five years after the investment selection/mapping decisions had already been made (PAI:135). The court's conclusion that the use of revenue sharing and the elimination of hard dollar fees were designed to assist ABB in its recruiting by concealing fees from potential and existing employees was rank speculation. The $8,000 annual savings ABB realized following the elimination of certain Fidelity hard-dollar charges was dwarfed by its $200 million in matching contributions to the Plan—a comparison that nullifies any inference of unlawful intent.

Appellate Case: 15-2792   Page: 37   Date Filed: 12/11/2015 Entry ID: 4345711

Because it was consistent with this Court's decision and with the need for finality, the district court was well within its discretion to decide the remand issues on the existing record.

## ARGUMENT

## Standard Of Review

A determination that an ERISA breach of fiduciary duty occurred represents a legal ruling reviewed *de novo*. *Tussey*, 746 F.3d at 333 (8th Cir. 2014). "Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 (2d Cir. 2009) (quoting *Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991)). The Court of Appeals therefore reviews the district court's damage computation methodology *de novo*. *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 727 (7th Cir. 2010).

Fact findings are clearly erroneous when the district court fails to consider or misinterprets crucial evidence. *Hayes v. Invesco, Inc.*, 907 F.2d 853, 856-57 (8th Cir. 1990). This Court will give a party the benefit of reasonable but not unreasonable inferences. *United Fire & Cas. Ins. Co. v. Garvey*, 419 F.3d 743, 746 (8th Cir. 2005). A reasonable inference is one which may be drawn from the

-25-

evidence without resort to speculation. *Okruhlik v. University of Ark.*, 395 F.3d 872, 878 (8th Cir. 2005).

## A. This Court's Damages Formulation Is Binding Under The Law-Of-The-Case Doctrine And The Mandate Rule.

Plaintiffs do not seek to re-visit the deferential standard of judicial review over fiduciary decision-making ordered by this Court. 746 F.3d at 333-35.[3/] They offer no comparison of Freedom's performance against the performance of any "managed allocation fund," as required by the IPS and this Court. They do not argue against the district court's determination that their new methods of calculating damages on remand were speculative; that they could have been but were not presented at trial; and that they were incompatible with the measure of damages they themselves had advocated (PAII:326, 346). They offer no evidence of Wellington's performance against ABB's own benchmark. They have conceded

_____

[3/]    While conceding the deferential standard, plaintiffs continue to suggest that the PRC lacked discretion under the Plan documents to make the investment selection/mapping decisions (Pl.Br.18). But this Court concluded that §3.12 of the PRISM Plan gave discretion to the Plan Administrator *and its agents*. This Court described that provision as a "broad grant of discretionary authority" and emphasized that the deferential standard was required in connection with the investment selection/mapping decisions. 746 F.3d at 333-35, 338.

In addition, §3.2 of the PRISM Plan states that the PRC "shall have authority to control and manage the investment assets of the Plan" (DA3:596). The grant of "authority to control and manage the investment of the assets" necessarily confers discretion. The absence of the word "discretion" in the Plan language does not prevent deferential review. *Hankins v. Standard Ins. Co.*, 677 F.3d 830, 835 (8th Cir. 2012); *Kennedy v. Georgia-Pacific Corp.*, 31 F.3d 606, 608-09 (8th Cir. 1994); *Cox v. Mid-Am. Dairymen, Inc.*, 965 F.2d 569, 571 (8th Cir. 1992).

Appellate Case: 15-2792      Page: 39      Date Filed: 12/11/2015 Entry ID: 4345711

that, of the funds ABB considered, "only the Freedom Funds were viable as the Tier 1 investment" (PAI:212).

As a consequence, the issues on this appeal are limited to (i) whether this Court's measure of damages is binding, and (ii) even if it is not, whether the district court should be reversed for following it.

### 1. Law Of The Case

Even though the law-of-the-case doctrine is the nub of this appeal, plaintiffs make but four scant references to it in their fifty-nine pages (Pl.Br.31, 34, 43, 54). Simply stated, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Little Earth of United Tribes, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 807 F.2d 1433, 1441 (8th Cir. 1986) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). A judgment of this Court puts all issues which were or could have been decided out of reach of the district court on remand, and the district court "is without power to do anything which is contrary to either the letter or spirit of the mandate construed in the light of the opinion of this court deciding the case." *Houghton v. McDonnell Douglas Corp.*, 627 F.2d 858, 865 (8th Cir. 1980) (quoting *Thornton v. Carter*, 109 F.2d 316, 320 (8th Cir. 1940)).

The same panel of this Court that decided the prior appeal recently emphasized the continuing force of the law-of-the-case doctrine. *Macheca*

*Transport Co. v. Philadelphia Indem. Ins. Co.*, 737 F.3d 1188, 1194 (8th Cir. 2013) (panel of Judges Riley, Bright and Bye).[4/]   Law of the case is based upon respect for finality, *Liberty Mut. Ins. Co. v. Elgin Warehouse & Equip.*, 4 F.3d 567, 571 (8th Cir. 1993)—the same respect for finality the district court emphasized on remand (PAII:326).  The law-of-the-case doctrine is reinforced by the "prior panel rule," stating that one panel of this Court has no authority to overrule an earlier decision of another panel. *Maxfield v. Cintas Corp.*, 487 F.3d 1132, 1135 (8th Cir. 2007).

The law of the case prevents all of plaintiffs' attempts to take a third bite at the apple in the district court.  Plaintiffs must accept that outcome because they have used erroneous and inflated measures of damages at each stage of this litigation.  They cannot be exonerated in this circumstance any more than if they had let the statute of limitations run.  This Court decided the measure of damages

---

[4/]     This Court has applied law of the case with special force not only in situations like *Macheca*, where the issue under consideration was never raised in the first appeal, but also to circumstances like this case, in which the issue was raised in a petition for rehearing but then denied. *Kansas Pub. Emps. Ret. Sys. v. Blackwell, Sanders, Matheny, Weary & Lombardi, L.C.*, 114 F.3d 679, 688 n.11 (8th Cir. 1997) ("KPERS's petition for rehearing en banc and for certiorari were denied.  Our ruling in *KPERS III* is the law of the case"); *Brown v. Lanyon Zinc Co.*, 179 F. 309, 310-11 (8th Cir. 1910) (prior ruling "was adhered to after due consideration of a timely petition for rehearing" and was subject to "the settled rule that propositions once decided by an appellate court are not open to reconsideration in that court upon a subsequent appeal").

Appellate Case: 15-2792     Page: 41     Date Filed: 12/11/2015 Entry ID: 4345711

on the investment selection/mapping issue in clear and unmistakable terms. That should be the end of the inquiry.

### 2. Mandate Rule

The mandate rule is a "close relation" to the law of the case. *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995). A district court on remand is bound to strictly obey the appellate mandate. *Bethea v. Levi Strauss & Co.*, 916 F.2d 453, 456 (8th Cir. 1990). This Court retains the authority to determine whether the terms of its mandate have been scrupulously and fully carried out. *Duncan Energy Co. v. U.S. Forest Serv.*, 109 F.3d 497, 499 (8th Cir. 1997).

This Court did not remand this action generally or for a new trial. Nor did it issue a roving commission to the district court to fashion some measure of damages different from the one it prescribed. It issued a limited remand only for proceedings "consistent with this opinion." 746 F.3d at 341. The district court thus properly recognized that it could not go beyond the scope of the limited remand. *United States v. Walterman*, 408 F.3d 1084, 1085 (8th Cir. 2005).

### B. This Court's Ruling On The Proper Measure Of Damages Is Not Subject To Any Exception For "Dicta."

The law-of-the-case doctrine applies to the measure of damages on the investment selection/mapping claim "because the exact same issues were raised on appeal and were decided favorably" to ABB. *Scheerer v. Hardee's Food Sys., Inc.*, 148 F.3d 1036, 1039 (8th Cir. 1998); *Little Earth*, 807 F.2d at 1441 (same).

-29-

Plaintiffs are plainly wrong in maintaining that this measure of damages issue was not raised on the prior appeal. In its Point entitled "[t]he Court's Damage Award of $21.8 Million Was Based On A Misunderstanding of The Plan And of Mapping" (DA2:286), ABB expressly argued:

> "[I]f mapping into Freedom was the breach, then [plaintiffs' expert] Pomerantz applied the wrong measure of damages. *The correct measure would be the difference between the performance of Freedom (the actual world) to the performance of the fund to which Wellington should have been mapped* (the "but for" world)." (emphasis added).

So ABB not only raised the question what the correct measure of damages would be, it also provided the answer. By requiring that the performance of the Freedom family be measured against the fund to which the Wellington assets "should have been" mapped, this Court agreed with ABB. Plaintiffs knew exactly what was on the table. Their failure to respond to ABB's argument does not transform this Court's statement on the measure of damages into dicta.

Plaintiffs also characterize this Court's measure of damages as dicta on the theory that "the judgment would have been reversed even had this statement been omitted." (PAI:195). But the same could be said for every other statement in the opinion when taken in isolation. This Court's explication was necessary so that the district court had a governing standard that would eliminate any doubt about the measure of damages and thereby prevent another reversal.

-30-

Plaintiffs' open-ended definition of dicta is not the law. In the seminal case of *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399-400 (1821), Chief Justice John Marshall defined dicta:

> "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken *in connection with the case in which those expressions are used*. If they go beyond the case, they may be respected, but ought not to control the judgment in a *subsequent suit* when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is *investigated with care, and considered in its full extent*. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated" (emphasis added).

This Court's measure of damages was made "in connection with the case" before it, not some other case. The specific and detailed terms of this Court's formulation demonstrate that it was "investigated with care, and considered in its full extent" rather than made off the cuff.

Further, in order to verify that the district court's damage calculus was *incorrect*, this Court had to decide what measure of damages was *correct*. Two of this Court's grounds for reversal were the district court's use of hindsight and its failure to apply the required deferential standard of judicial review. A third ground was that the district court's measure of damages was inconsistent with the proper measure. The declared measure of damages was thus a binding alternative holding rather than dicta. *Brazzell v. United States*, 788 F.2d 1352, 1357 n.4 (8th Cir. 1986). *See United States v. Sanchez*, 35 F.3d 673, 678 (2d Cir. 1994). It was

Appellate Case: 15-2792     Page: 44     Date Filed: 12/11/2015 Entry ID: 4345711

"essential to the court's reasoning." *Robinson v. Norris*, 60 F.3d 457, 460 (8th Cir. 1995).

Plaintiffs maintain that this Court's use of the phrase "it seems" indicated uncertainty and left open other possible damage measures for remand. Research discloses only one case on point. In *Anderson v. Reid*, 14 App. D.C. 54 (1899), the Court of Appeals had to decide whether a rule announced by the U.S. Supreme Court beginning with the phrase "it would seem" thereby became dictum. The D.C. Circuit ruled that it was bound by the Supreme Court pronouncement and that the high court's insertion of the words "it would seem" did not change that. The Court of Appeals observed that the statement at issue was, as in this case, "made industriously and upon full consideration of the subject" and concluded "[w]e can not regard such a statement as having been *obiter dictum*." *Id.* at 82.

As a matter of policy, trial courts should not be allowed to disregard appellate statements at an earlier stage of the same case as dicta unless the Court of Appeals clearly indicates such statements are gratuitous and non-binding. Those cases that refer to appellate dicta in early stages of the same case have been opaque and without analysis. *See*, *e.g.*, *United States v. Bloate*, 655 F.3d 750, 755 (8th Cir. 2011). By contrast, Justice Marshall's above-quoted passage in *Cohens* defined dicta from the perspective of a "subsequent suit." 19 U.S. at 399. This Court has adopted that passage. *United States v. Lunsford*, 725 F.3d 859, 864 (8th Cir.

Appellate Case: 15-2792    Page: 45    Date Filed: 12/11/2015 Entry ID: 4345711

2013). Plaintiffs' cases—*Passmore v. Astrue*, 533 F.3d 658 (8th Cir. 2008), *Arkansas Game & Fish Commission v. United States*, 133 S.Ct. 511, 520 (2012), and *Lunsford*, 725 F.3d at 864—all found dicta in *prior litigation*, not from a prior opinion in the same case.

In *Sanchez*, the Second Circuit concluded "the law-of-the-case doctrine forecloses reconsideration on remand of issues that have been 'explicitly or implicitly decided on appeal.' This formulation precludes circumvention of an express ruling by this court, on remand, on the basis that the determination is not the 'holding' of our appellate decision." 35 F.3d at 678 (citation omitted). This Court likewise applies the law of the case to issues decided implicitly as well as explicitly. *UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995). Permitting district courts to decide whether the appellate directives they receive are binding upon them can only invite serious mischief.

Finally, to characterize a statement as dicta does not mean it is error to follow it. *Speed v. Transamerica Corp.*, 135 F.Supp. 176, 192 (D. Del. 1955) ("[N]o court is ever required to reject either its own dicta or that of another court"). As demonstrated below, this Court's measure of damages was plainly correct rather than clearly erroneous. See Part C below. Dicta that is "persuasive authority" should be followed. *S.B.L. ex rel. T.B. v. Evans*, 80 F.3d 307, 310 (8th

Appellate Case: 15-2792     Page: 46     Date Filed: 12/11/2015 Entry ID: 4345711

Cir. 1996); *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007).

Whatever the scope of the law-of-the-case doctrine, the mandate rule appears to have no dicta exception. Indeed, some courts have recognized that the mandate rule is broader than the law of the case. *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995); *Brown v. Astrue*, 597 F.Supp.2d 691, 702 (N.D. Tex. 2009). This Court's mandate for proceedings "consistent with this opinion" is a directive that the district court adhere to the appellate decision in its entirety. Through the use of that phrase, this Court demanded adherence to the totality of its decision.

## C. This Court's Ruling On The Proper Measure Of Damages Was Not Clearly Erroneous And Does Not Result In Any Manifest Injustice.

The non-jurisdictional, discretionary nature of the law of the case does not mean its application can be arbitrary or willy-nilly. In *Bethea*, 916 F.2d at 457, this Court made clear that, "[e]ven though the law of the case doctrine is not based on jurisdiction, the common law strongly directs courts to follow decisions made in an earlier proceeding unless [1] substantially different evidence is introduced or [2] the earlier decision is both clearly erroneous and works a manifest injustice or [3] some other extraordinary circumstances exist." Plaintiffs rely solely upon the "clearly erroneous/manifest injustice" exception.

Appellate Case: 15-2792    Page: 47    Date Filed: 12/11/2015 Entry ID: 4345711

### 1. "Clearly Erroneous"

It is important to note at the outset that plaintiffs seek to justify their current theory of two independent damage awards on the grounds that this Court distinguished between participants who invested in Wellington and those who invested directly in the Freedom family (746 F.3d at 339; Pl.Br.8-9, 53). But this Court made that distinction in order to explain the errors within the single damage computation plaintiffs offered at trial, not to sanction two recoveries. Plaintiffs can't profit from the mistakes they made in their single calculation by now obtaining an award greater than that this Court already found "speculative and exce[ssive]" *Id*.

### (a) *Bierwirth*

*Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985) and this Court's prior opinion are in no way inconsistent and certainly do not result in a "circuit split." While a split among the Circuits was their basis for seeking certiorari jurisdiction in this case, plaintiffs never asserted any such split on the measure of damages issue when petitioning the Supreme Court here (DA5:896-932). On the prior appeal we cited *Bierwirth* ourselves for the proposition that the correct measure of loss requires a comparison of actual performance against what the Plan would have earned in a "but-for" world (DA2:286). That is what *Bierwirth* says. 754 F.2d at 1056. And in requiring that the loss here be measured by the Freedom family's

Appellate Case: 15-2792    Page: 48    Date Filed: 12/11/2015 Entry ID: 4345711

actual performance against the "should have been" alternative, that is what this Court said as well. The difference in outcomes between the two cases rests here, as it usually does, upon the application of the controlling legal standard to the particular facts of each case.

*Bierwirth's* "most profitable alternative" paradigm applies only "[w]here several alternative investment strategies [are] equally plausible." 754 F.2d at 1056. In the Grumman pension plan, there would have been a virtually unlimited number of products other than Grumman's own stock in which the defendants could have invested the plan's assets. By contrast here, the IPS limited the alternatives to "several managed allocation funds." Plaintiffs provided no such alternative. ABB's offer of proof demonstrates there was only one alternative and that the Freedom family had outperformed it (DA2:448). In addition, plaintiffs' hypothetical fund was not a "publicly available mutual fund," as required by the IPS.

Further, *Bierwirth* largely rests on the "uncertainty" in measuring damages that defendants created by their wrongful acts. Here plaintiffs are the ones who caused the "uncertainty" in damages through the use of their hypothetical fund. Pomerantz's "customized" TDF was created from existing investment options in

-36-

the 401(k) plan's lineup (PAI:237-38). Plaintiffs and Pomerantz[5/] needed discovery from ABB on remand in order to manufacture this hypothetical fund, thereby proving that this handiwork was created *ex post* (PAI:161-62; DA2:440-41). Who can say what a customized fund created by a prudent fiduciary in the year 2000 would have looked like? It likely would bear no similarity to what plaintiffs' litigation expert chose in order to prove damages after-the-fact. Plaintiffs try to justify their hypothetical product by claiming that Mr. Cutler recommended one (Pl.Br.9-10), but their record citations do not support that. Mr. Cutler merely recognized that *participants* could achieve something approaching the Wellington debt/equity balance through their own investment decisions. Ultimately, however, none of this is controlling because, as the district court pointed out, plaintiffs failed to prove damages pursuant to *Bierwirth*: "[E]ven if the Court assumes that the performance of the alternative target-date fund that had the highest rate of return would be the proper measure of damages, Plaintiffs have presented no evidence of what that figure would be" (PAII:346).

---

[5/] Pomerantz is a controversial expert. His testimony was the entire basis for the $21.8 million damage award on the investment selection/mapping claim that this Court set aside. His work has been criticized or rejected by a number of trial judges in other reported cases. *George v. Kraft Foods Global, Inc.*, 800 F.Supp.2d 928, 933-34 (N.D. Ill. 2011); *Atwater v. NFL Players Ass'n*, 2009 U.S. Dist. LEXIS 98236, at *12 (N.D. Ga. Mar. 26, 2009); *Eastman v. First Data Corp.*, 292 F.R.D. 181, 186 (D.N.J. 2013); *Tibble v. Edison Int'l*, 639 F.Supp.2d 1074, 1115-16 (C.D. Cal. 2009); *Gallus v. Ameriprise Fin., Inc.*, 497 F.Supp.2d 974, 982 (D. Minn. 2007).

Appellate Case: 15-2792     Page: 50     Date Filed: 12/11/2015 Entry ID: 4345711

In any event, the question here is not whether *Bierwirth* and this Court's measure of damages are inconsistent, though that might be an issue if this were the first appeal. The question at this stage is whether *Bierwirth* renders this Court's measure of damages clearly erroneous and thus not the law of the case. But *Bierwirth* is not an intervening decision from the Supreme Court or this Court. *See*, *e.g.*, *Morris v. American Nat'l Can Corp.*, 988 F.2d 50, 52 (8th Cir. 1993). It is a prior decision from another Circuit. Even if it did come down to a choice between *Bierwirth* and this Court's opinion, the answer would be clear. As Judge Posner pointed out in *Leister v. Dovetail, Inc.*, 546 F.3d 875, 881 (7th Cir. 2008), the "most profitable alternative" theory requires the application of hindsight: the court must look back to determine which investment product had performed best. "Such a methodology would yield a windfall, given the uncertainty of investments." *Id*. This Court has already condemned such hindsight. 746 F.3d at 338.

In the circumstances of this case, if the selection of the Freedom family were deemed imprudent, then damages had to be based on its performance relative to a prudent managed allocation alternative. The alternative with the least return would satisfy the fiduciaries' obligation so long as it was a prudent choice, as this Court required.

Appellate Case: 15-2792     Page: 51     Date Filed: 12/11/2015 Entry ID: 4345711

**(b)     Elimination Of Wellington**

In addition, this Court was correct in concluding that damages could not be based on plaintiffs' comparison of the relative performance of Wellington and the Freedom family.

**(i)     Difference in Products**

TDFs like the Freedom family are a different product than a static fund like Wellington.  A TDF near to its target retirement date is weighted toward bonds or other fixed-income instruments.  Because of its design, its performance will necessarily differ from a static mutual fund that maintains the same allocation of debt and equity investments over time.  In a rising stock market, a TDF close to its retirement date will have lower returns than its static fund counterpart, still heavily invested in equities.  In a declining stock market, that TDF will have higher returns than the same static fund because of the difference in asset allocation among the same investment components.  *See*, *e.g.*, William F. Sharpe, *Asset Allocation: Management Style and Performance Measurement*, 18 J. Portfolio Mgmt. 7 (Winter 1992) ("It is widely agreed that asset allocation accounts for a large part of the variability in the return on a typical investor's portfolio").

Because of these differences in asset allocations, any performance difference between a family of TDFs like Freedom and a single static, balanced fund like Wellington is to be expected.  The two products are *intended* to perform

differently. If a Freedom fund with a near-term target date sought to outperform Wellington in a rising market, it would not be acting as an intentionally conservative investment and would not be doing its job. Using Wellington to measure the performance of the Freedom family is an apples-to-oranges comparison. This Court properly rejected the district court's damages award, one based upon the relative performance of two different products.

### (ii)    Plan-Design Change

Another reason the elimination of Wellington could not form the basis for damages is that ABB had a legal right to remove that fund from the Plan platform. ABB removed Wellington in connection with a plan-design change: eliminating a static fund and replacing it with a dynamic family of funds.

In *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009), the Seventh Circuit pointed out that decisions regarding the particular mix of investment vehicles in a Plan "bears more resemblance to the basic structuring of a Plan than to its day-to-day management." Plan design is a settlor function, not a fiduciary function. *Hughes Aircraft  Co. v. Jacobson*, 525 U.S. 432, 444 (1999); *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996). This Court properly included the investment selection/mapping decisions under the heading of "Plan Redesign" in its prior ruling. 746 F.3d at 331-32. As a matter of law, there can be no fiduciary liability for a plan-design change, particularly one, as here, that was confirmed by

-40-

plan amendment. *Hughes Aircraft*, 525 U.S. at 444; *Lockheed*, 517 U.S. at 890; (DCA:806). In the final analysis, because defendants had the right to eliminate Wellington in connection with a plan design change, the performance of that fund does not matter.

It was entirely proper to choose the Freedom family over Wellington "because [dynamic funds] do not require a participant to re-evaluate his/her decisions over time" (PAIII:754). A reasonable fiduciary could have believed at the time that a TDF is a better product "for participants unwilling or unable to make a personal asset allocation decision" because, with the passage of time, the TDF would make those decisions for them. The decision to offer a dynamic managed allocation fund made Wellington unnecessary and moot (Tr.5:1162; 12:2763-64).

### (iii)   Lack of Precedent

Neither plaintiffs nor the district court have cited any case imposing fiduciary liability based upon the removal of a single fund option from a multi-option Plan. There are good reasons for that lack of precedent. When a single fund is removed from a Plan, the participants have the entire universe of product opportunities available to consider for reinvestment. They can even reinvest in the eliminated fund on the open market. Whether participants win or lose becomes a function of their own investment decisions, not of the ongoing performance of the

-41-

eliminated option. This is the element of "participant choice" that this Court emphasized. 746 F.3d at 339. ERISA simply does not mandate the presence of any particular investment option in a 401(k) plan.

### (iv) "Several" Managed Allocation Funds Requirement

Having eliminated the static Wellington fund as a comparator, this Court determined that the performance of the Freedom family had to be measured against a *dynamic* "managed allocation" alternative. Plaintiffs acknowledge that they "did not present evidence of other target date mutual funds." (Pl.Br.22). The district court thus properly concluded that plaintiffs failed to present any evidence of damages under this Court's formulation. Plaintiffs nonetheless insist that the district court erred in interpreting the IPS term "several managed allocation funds" to exclude Wellington. But Wellington is a single fund that could never meet the "several . . . funds" mandate that was clearly intended for a fund family, and its static investment mix could add nothing to the several mixes already offered by the Freedom family.

### (c) Addition of The Freedom Family

### (i) Law Of The Case, Again

Plaintiffs failed to claim damages based upon the relative performance of the Freedom family and the hypothetical customized fund at any time through and

Appellate Case: 15-2792    Page: 55    Date Filed: 12/11/2015 Entry ID: 4345711

including trial.[6/] They "may not stand better off as regards the law of the case than one who has argued and lost." *In re MidAmerican Energy Co.*, 286 F.3d 483, 488 (8th Cir. 2002). A party "may not now use the opportunity created by the remand to raise [an] issue for the first time." *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 891 (7th Cir. 2013).

### (ii)    Failure to Cross Appeal

A separate account is an investment account in which assets are managed for the benefit of one client (PAI:139). Because plaintiffs' hypothetical fund was proposed for only one client, i.e. the Plan, and was not a publicly-available mutual fund, it was a separate account. But the district court had already ruled that ABB had no duty to create more separate accounts (PAI:141-43). Plaintiffs' failure to cross-appeal that determination is yet another reason why this claim is barred. *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845 n.4 (8th Cir. 2006).

---

[6/]    While plaintiffs' current position is that the addition of Freedom was itself an actionable breach that merits a substantial recovery (Pl.Br.9-10, 30), they took the opposite position on the first appeal. There, in order to circumvent ABB's statute of repose defense, they argued that the addition of "Fidelity's Freedom Funds to the Plans . . . was not an actionable breach." (DA2:376). They have been playing fast and loose with this Court by deliberately changing positions according to the exigencies of the moment.

### (iii)   Plan Design Change

The addition of the Freedom family was the final component to the year 2000 Plan re-design.  That addition, just like the removal of Wellington, was a non-fiduciary decision.  See section C1(b)(ii) above.  While plaintiffs complain that they can find no recorded vote for the elimination of Wellington in the May 2000 PRC meeting minutes, the addition of the Freedom family is formally described in the November 2000 minutes (PAIII:754).  Not only that, the Plan was amended to add the Freedom family as an investment option (DA3:608, 672).  As a matter of law, such plan amendment decisions are non-fiduciary in nature.  *Hughes Aircraft*, 552 U.S. at 444; *Lockheed Corp.*, 517 U.S. at 890; *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 251 (5th Cir. 2008).

### (iv)   The Freedom Family As "Several Managed Allocation Funds"

Plaintiffs are simply wrong in maintaining that the Freedom family could not satisfy the IPS demand for "several managed allocation funds" (Pl.Br.42).  In contrast to Wellington, there were "several" funds in the Freedom family, specifically five funds offered in ten-year incremental target dates tied to participants' anticipated times of retirement (PAIII:754).

### (v)   No Better Alternative

According to plaintiffs, "[i]n 2000 and 2001, there were very few dynamic target-date funds in the market to consider for inclusion in the Plan."  (PAI:236-

Appellate Case: 15-2792   Page: 57   Date Filed: 12/11/2015 Entry ID: 4345711

37).  The district court found (incorrectly) that the BGI family, like Wellington, was static and (correctly) that the T. Rowe Price target-date funds were not yet on the market (Tr.8:1822, 1825; PAI:212).  While the BGI family was a dynamic managed allocation group of funds, it was not a better alternative than the Freedom family that had so dramatically outperformed it (DA2:448).  Again, plaintiffs offered no evidence that any available target-date fund family was performing better than the Freedom family at the time of its selection.  They likewise offered no evidence of any "publicly available mutual funds or their institutional equivalents" that could have been chosen instead of the Freedom family.

### (d)  Mapping

Although acknowledging on remand that the addition of the Freedom family was not imprudent (PAII:341), the district court concluded that mapping the participants' Wellington assets into the Freedom family was a fiduciary breach because it provided "a benefit to Fidelity . . . not only by increased revenue sharing but also by adding another Fidelity investment to the PRISM platform" (PAII:335).

The fallacy here is the assumption that, because mapping had the effect of benefitting Fidelity, that must have been its purpose.  *Dytrt v. Mountain State Tel. & Tel. Co.*, 921 F.2d 889, 896 (9th Cir. 1990) (recognizing distinction between "motivating factor" and "incidental effect" in ERISA context).  In fact, ABB was obligated to map rather than distribute the Wellington assets to the participants

Appellate Case: 15-2792     Page: 58     Date Filed: 12/11/2015 Entry ID: 4345711

because defined contribution plan assets must be maintained in trust. *See* 29 U.S.C. §1103 ("all assets of an employee benefit plan shall be held in trust by one or more trustees"). They cannot be removed from the plan without adverse tax consequences for the participants. 26 U.S.C. §72(t)(1) (subjecting participants to 10% excise tax on early distributions from a qualified retirement plan). For these reasons, participant assets must be moved to another investment option when an option is eliminated.

With the enactment of the Pension Protection Act of 2006, Congress gave safe-harbor protection to fiduciary mapping decisions. While not retroactive, the statute and regulations are a clear expression by ERISA's lawmakers and enforcement agency that fiduciaries should be immune from liability for doing what ABB did here. Under 29 U.S.C. §1104(c)(5) and the Department of Labor's regulation at 29 C.F.R. 2550.404c-5(b)(1), there can be no liability for mapping assets into a "Qualified Default Investment Alternative" ("QDIA"). A target-date fund, such as the Freedom family, is an example of a QDIA eligible for this protection. See Department of Labor, "Default Investment Alternatives Under Participant Directed Individual Account Plans" 29 C.F.R. Part 2550, 72 F.R. 60452, 60479 (Oct. 24, 2007). "[T]he rule does not require a plan fiduciary to undertake an evaluation as to which of the qualified default investment alternatives provided for in the regulation is the most prudent for a participant or the plan." *Id.*

Appellate Case: 15-2792   Page: 59   Date Filed: 12/11/2015 Entry ID: 4345711

at 60453. Plaintiffs themselves have acknowledged that "DOL regulations recognize target-date funds as qualified default investment options." (PAI:231). In *Bidwell v. University Medical Center, Inc.*, 685 F.3d 613, 615, 618 (6th Cir. 2012), the Sixth Circuit confirmed that the statute and regulations created a safe harbor.

The district court nevertheless condemned the mapping in *this* case because it provided additional revenue for Fidelity. By definition, however, because the transferee of mapped assets *always* receives the benefits attendant to managing such assets, mapping would be suspect under the district court's reasoning in every case—precisely the opposite of what Congress and the DOL have declared. The Freedom family was the obvious mapping default option here because, after the elimination of Wellington, those funds constituted the only balanced investment option in the Plan (Tr.5:1063-64, 1162; DA3:652). Neither plaintiffs nor the district court has ever suggested a mapping alternative that would have been preferable to the Freedom family.

The district court concluded that, because participants did not dramatically shift their asset allocations in "a short amount of time," ABB knew that the mapped Wellington assets would remain in the Freedom family of funds (PAII:333). But that is merely a conspiracy theory, unsubstantiated by any proof. There is not a shred of evidence that ABB was aware in advance of how

-47-

participants would react to mapping. The three-month (PAII:400-22, 424-52) and one-year (PAII:461-78) allocation data plaintiffs cite (Pl.Br.16) are short-term and, in any event, do not reflect transfers between funds. Other information (PAIII:809-10) was not compiled until 2001, after the investment selection/mapping decisions had been made. In any event, evidence that participants tended over the short term to stay with an investment they had chosen for themselves says nothing about how they would react over the long term when someone else transferred their assets to another fund.

### 2. "Manifest Injustice"

Even if plaintiffs could establish the "clearly erroneous" prong, there is no "manifest injustice" because the law-of-the-case doctrine works both ways. Had this Court not already resolved the statute-of-repose issue against it (746 F.3d at 337), ABB could convincingly argue that the six-year time bar of ERISA §413(1) (29 U.S.C. §1113(1)) cuts off the investment selection/mapping claim in its entirety because that claim was *never* pleaded and does not "relate back" to any pleading by amendment. See Rule 15(c)(1), F.R.C.P. ABB cannot make that argument now anymore than plaintiffs can start all over with the measure of damages.

Appellate Case: 15-2792    Page: 61    Date Filed: 12/11/2015 Entry ID: 4345711

**D.** **Alternatively, The Judgment Below Should Be Affirmed Because The ABB Defendants Are Not Liable On The Investment Selection/Mapping Claim.**

The district court devoted more than nineteen pages of its twenty-four page order on remand to renewing its liability findings against ABB. But because the district court rendered judgment in ABB's favor based entirely on plaintiffs' failure to prove damages, those liability findings were unnecessary to the outcome. It is ironic that, under plaintiffs' broad view, those liability findings would be the true dicta because, once it found there were no damages, the district court did not have to reach liability or the abuse-of-discretion findings upon which it was based.

Defendants were unable to appeal from the liability findings because this Court only reviews judgments, not opinions. *Jennings v. Stephens*, –U.S.–, 135 S.Ct. 793, 799 (2015); *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 n.3 (8th Cir. 2014). Those findings are nonetheless subject to review on this appeal because this Court "can affirm the District Court's judgment on grounds supported by the record, even if those grounds were rejected by the trial court, as they were here." *United States v. English*, 329 F.3d 615, 617 (8th Cir. 2003). As a result, even if this Court were now to repudiate its own measure of damages, the judgment below must be affirmed because ABB was also entitled to prevail on the issue of liability.

-49-

This is where the court's decision to adjudicate an unpleaded claim fits in. Plaintiffs' failure to plead the investment selection/mapping theory demonstrates that they treated the theory as a throw-away item. More important, the absence of any pleaded contours helps to explain why the district court got it so wrong. That heightened risk of error is why judges normally try to avoid deciding matters that were never properly raised or consistently presented.

ABB was severely prejudiced by the lack of clarity arising from this unpleaded claim. ABB did not present extensive evidence of Wellington's underperformance until its offer of proof on remand because it appeared, particularly in view of the Pomerantz testimony, that plaintiffs were not challenging the removal of Wellington at all. Cutler was also mistaken in recalling that BGI was a static fund, just as anyone would be ill-prepared to defend fully against an unpleaded claim. The absence of a pleaded claim permitted plaintiffs to change their position, stating first that the removal of Wellington was not imprudent and later that is was imprudent.

The failure to plead also hoists plaintiffs on their own petard because the class certification order eviscerates the investment selection/mapping claim. The certified class consists only of those "affected by the conduct alleged in the Complaint." (DA1:120, 230). Because the investment selection/mapping theory was not "conduct alleged in the Complaint" or its amendment, there can be no

Appellate Case: 15-2792    Page: 63    Date Filed: 12/11/2015 Entry ID: 4345711

class recovery on the claim.  See Fed.R.Civ.P. 23(c)(1)(B) (certification order must define the class claims).

### (a)    Ignoring Key Facts And Mischaracterizing Others

The district court's liability findings, based entirely on what it viewed as ABB's "conflict of interest," were wrong at every level.  The court ignored critical facts, mischaracterized others, and repeatedly drew unreasonable inferences about ABB's intent.

The starting point for analysis is the abuse-of-discretion standard itself.  Under that standard, the district court's limited role is "to determine whether a reasonable person could have—not would have—reached a similar decision." *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008).

In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 116 (2008), the Supreme Court made clear that a conflict of interest is merely "one factor among many that a reviewing judge must take into account" when determining whether a fiduciary has abused its discretion.  *Glenn* demands that judges reach "a result by weighing all [factors] together."   *Id.* at 117.   Under the abuse-of-discretion standard, "the proper inquiry is whether the . . . decision was reasonable; *i.e.*, supported by substantial evidence."  *Fletcher-Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001) (quoting *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996)).  Substantial evidence means "'more than a scintilla but less than a

Appellate Case: 15-2792     Page: 64     Date Filed: 12/11/2015 Entry ID: 4345711

preponderance'" of evidence. *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 832 (8th Cir. 2014) (citation omitted). *Glenn* spoke approvingly of *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477-78 (1951), a case explaining that a "substantial evidence" review requires a review of the "whole record" rather than facts "viewed in isolation." *See* 554 U.S. at 117, 119.

So even though the district court was not entitled to pick and choose among the facts, it ignored the "whole record" of actions the fiduciaries took that were *adverse to* Fidelity: (i) its removal of Fidelity's Magellan Fund, Fidelity's leading moneymaker in the Plan (Tr.5:1125-26; 6:1246; DA3:682; DA4:895); (ii) its elimination of other Fidelity funds from the Plan (Tr.5:1110; PAIII:754; DA4:775, 895); (iii) its mapping of assets from Fidelity funds into *non*-Fidelity funds (DA4:763, 775); (iv) its rejection of Fidelity's demand for an increased per participant fee to make up for the revenue Fidelity lost from the removal of Magellan (Tr.3:580; 4:818-19; 10:2238-39; 15:3517-18; 15:3527-28); and (v) Fidelity's decline in compensation by more than half during the class period, while the Plan assets and the average account balance per participant each grew in that same time frame (Tr.6:1271-72; 7:1527-28; DA4:776).

The court similarly disregarded the fact that ABB first learned of Fidelity's cross-subsidization in 2005, years *after* its selection of the Freedom family in 2000 (PAI:135). And in finding that Wellington should have remained as a plan option,

Appellate Case: 15-2792    Page: 65    Date Filed: 12/11/2015 Entry ID: 4345711

the court failed to consider what any prudent fiduciary would see as obvious: that Tier 1 participants—defined as those who were "unwilling or unable to make a personal asset allocation decision" (PAIII:591)—would prefer a dynamic managed allocation fund like the Freedom family to do that work for them instead of a static fund that did not.

The district court mischaracterized the mapping of participant investments from Wellington into the Freedom family as a "forcib[le]" transfer (PAII:336), even though the Freedom family was merely a default option triggered when an investor in the eliminated fund failed to select a replacement (Tr.1:170-71; 2:353; 5:1062-63; 11:2681; 13:3019). Again, the court erred in finding that ABB violated the IPS in choosing the Freedom family alone to populate Tier 1 without including Wellington as well (PAII:333 n.8), because this family of five mutual funds with ten-year increments itself constituted the necessary "several managed allocation funds."

### (b)    Inferring Unlawful Intent

The record demonstrates a thorough and reasoned fiduciary process. The fiduciaries received information about the advantages the new TDFs offered over static funds, about Wellington's recent sub-par performance against ABB's benchmark, and about the increased outflow of participant investments in Wellington (DA4:768, 771). After that information was presented, a vote was

Appellate Case: 15-2792    Page: 66    Date Filed: 12/11/2015 Entry ID: 4345711

taken to adopt the Freedom family as the Tier 1 managed allocation alternative, and the process was documented (PAIII:754; DA3:642; DA4:806). Again, there was no evidence of any better alternative to the Freedom family. In view of the "whole record," defendants were procedurally prudent. *See*, *e.g.*, *Brieger v. Tellabs, Inc.*, 629 F.Supp.2d 848, 861-62 (N.D. Ill. 2009).

Against this written record, the district court relied entirely on "circumstantial evidence"—so-called "procedural irregularities," "inconsistent explanations" and "too many coincidences"—as its basis for concluding that "ABB was conflicted when it chose to take the Wellington Fund assets and put them into the Freedom Funds" (PAII:337). This "circumstantial evidence" was really a series of unreasonable inferences—unreasonable because based on speculation. *Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479, 482 (8th Cir. 2002) ("A reasonable inference is one 'which may be drawn from the evidence without resort to speculation.'") (citations omitted).

Inferring a bad motive is risky business under any circumstances, but it is irreconcilable with a deferential standard of review. A court required to defer to a fiduciary's exercise of discretion cannot simultaneously infer that the fiduciary had a wrongful purpose. Even under a non-deferential standard, courts are reluctant to infer wrongful intent based upon non-compelling circumstantial evidence. *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1035 (8th Cir. 2007) ("evidentiary

Appellate Case: 15-2792    Page: 67    Date Filed: 12/11/2015 Entry ID: 4345711

link" needed to justify a reasonable inference of retaliatory motive under ERISA §510).

The order on remand is rife with speculation, largely because the court equated the effect of a decision with its purpose. For example, according to the district court, ABB chose the Freedom family, resulting in increased revenue sharing for Fidelity *in order to* maintain the parties' mutually beneficial relationship for corporate services and recordkeeping (PAII:328). But ABB's knowledge that Fidelity would benefit from revenue sharing, that Fidelity would obtain higher fees from the Freedom family than from Wellington and that Fidelity would receive assets from mapping are all neutral facts that imply no improper motive.

This Court pointed out that revenue sharing is a "common and 'acceptable' investment industry practice[]." 746 F.3d at 336. "[T]he dollar volume of revenue sharing is substantial and the practice is widely used." Dana M. Muir, *Revenue Sharing in 401(k) Plans: Employers As Monitors?*, 20 Conn. Ins. L.J. 485, 492 (2014). And the fiduciaries have no duty to choose the fund with the lowest fee: "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Hecker*, 556 F.3d at 586; *Leimkuehler v. American United Life Ins. Co.*, 713 F.3d 905, 912 (7th Cir. 2013) ("the cheapest option may not inevitably be

-55-

the best option"). Lower fees provide no assurance that an investment product will fit within the investor's goals. Because of the professional management required to determine their glide paths and asset allocations, TDFs would necessarily bear higher fees than a static fund would.

The district court inferred that ABB's John Sackie rejected any effort to obtain rebates from Fidelity because that would be against Fidelity's financial interests (PAII:335-36). But when Sackie expressed concern about Fidelity "squeezing the balloon," he was only recognizing reality. "There is . . . no particular reason to think that [the service provider] would not seek to make up the revenue it missed [through rebates] by charging higher direct fees to [the PRISM Plan]." *Leimkuehler*, 713 F.3d at 912. No service provider is likely to accept an arrangement requiring it to perform the same amount of work for less money. It will try to make up what it lost. Recognizing that reality is not disloyalty. Remarkably, the court further inferred that the disloyal motive it attributed to non-decision makers Sackie and Cutler should apply to the actual decision-maker, the entire PRC (PAIII:748, 750-51, 752, 754). Inference upon inference was pulled out of thin air.

The district court's findings also misinterpret basic precepts of finance. The court put forward four points of "circumstantial evidence" to support its disloyalty findings (PAII:337). First, it referred to "the procedural irregularities including the

-56-

strong performance of the Wellington Fund." There were no "procedural irregularities" and no true showing of "strong performance," only the district court's selection of a benchmark ABB did not use. The court's belief that it was a fiduciary breach to remove Wellington because it used the Pomerantz benchmark rather than ABB's—while simultaneously ignoring the role of the removal of this fund in the plan design change—placed its own value judgments over those of the fiduciaries in contravention of the abuse-of-discretion standard. Plaintiffs likewise ignore fiduciary discretion when they argue that ABB "could have" kept Wellington as a Tier 3 "actively-managed" fund option and that defendants could have created a customized fund rather than adding Freedom (PAI:231-32). "Could have" does not mean "should have"—especially when the static Wellington product became unnecessary.

The second point of "circumstantial evidence" was "ABB's inconsistent explanations for removing Wellington and mapping its assets to Fidelity's Freedom Funds" (PAII:337). Presumably this "inconsistency" is between ABB's selection of Freedom and its statement that removal of Wellington would allow the participants to create their own balanced fund from the Plan's other investment options. But both statements were true, and they are easily reconcilable: Mr. Cutler's statement at the May 23, 2000 PRC meeting that the removal of Wellington would allow participants to create their own balanced fund was made

-57-

six months *before* the November 14, 2000 selection of the Freedom family as the Tier 1 managed allocation funds (PAI:114). ABB's reasons for eliminating Wellington were cumulative, not "inconsistent."

Third, the district court said "ABB took a substantial part of the PRISM Plan's assets and put them in an investment that was so new that ABB needed to make an exception to the IPS" (PAII:337). This apparently refers to the absence of a five-year performance history for the Freedom family. But the IPS contained no such requirement. It stated that "[f]und performance will be evaluated over rolling three and five year time periods" but imposed no such limitation on fund *selection*.

Fourth, the district court relied on "Fidelity's explicit offer to give ABB a better deal if the Wellington assets were mapped into the Fidelity Freedom Funds." (PAII:337). But Fidelity's intent cannot be imputed to ABB. There is nothing to indicate that ABB based its decision upon whatever Fidelity intended. To the contrary, the fiduciaries rejected the Fidelity offer most favorable to ABB: the alternative that would have eliminated all the recordkeeping fees ABB was itself paying in return for keeping Fidelity's index funds in the Plan. ABB chose to eliminate the Fidelity index funds from the Plan.

ABB had no motive to favor Fidelity, just one of its many service providers. To reiterate, ABB was not even aware of Fidelity's cross-subsidization among plans until 2005, five years after it already had chosen the Freedom family. The

Appellate Case: 15-2792     Page: 71     Date Filed: 12/11/2015 Entry ID: 4345711

court suggested two disloyal motives. One was that the undisclosed use of revenue sharing and the reduction in hard dollars fees that accompanied the selection of the Freedom family would assist in employee recruitment and retention because workers would be led to believe they would not have to pay any expenses (PAI:114). This is a non-sequitur unsupported by proof and compounded by rank speculation.

The other motive the court suggested was that, in replacing Wellington with the Freedom family, ABB was able to reduce the hard dollar fees it was paying out of its own pocket (PAI:124). The court pointed to ABB's acceptance of the Jeffrey Cutts option #2—"if the Wellington Funds were mapped to the Freedom Funds but Fidelity's index fund were not retained in the Plan's investment platform, recordkeeping fees would go from $10 to zero for employees in the Main PRISM Plan, and from $10 to $8 for each employee in the Union PRISM Plan." (PAI:103). But under that option, all salaried participants *benefitted*—they no longer paid anything.

True, ABB had been paying the difference between the hard-dollar fees charged to union and salaried participants (PAI:114), and by choosing Cutts option #2, ABB reduced the hourly participant fee from $10 to $8 (PAI:113). But the only benefit to ABB was an $8 reduction ($8 for hourly minus zero dollars for salaried) in the amount it was paying for the approximately 1,000 union

participants (Tr.2:352). This $8,000 annual savings was *de minimis*, especially in relation to ABB's $200 million in matching contributions to the participants (Tr.10:2337-38; DA3:777). With this much skin in the game, ABB had a powerful incentive to strengthen the Plan rather than do it harm.

## E. The District Court Did Not Abuse Its Discretion By Resolving The Issue Of Damages On Remand Based Upon The Existing Record.

On remand, the decision whether to reopen the record is left to the sound discretion of the trial court. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 551 (1983) (quoted in *United States v. Castellanos*, 608 F.3d 1010, 1015 (8th Cir. 2010)); *Harker v. United States (In re Harker)*, 357 F.3d 846, 849 (8th Cir. 2004); *Molasky v. C.I.R.*, 997 F.2d 1241, 1243 (8th Cir. 1993).

The district court offered a number of reasons for refusing to reopen the record for additional evidence—first, the case had been remanded for further consideration, not for a new trial; second, extensive discovery and motion practice had already taken place; third, the additional evidence could have been submitted at the time of the 2010 trial; fourth, neither side asked for additional discovery on remand in connection with this Court's declared measure of damages; and, finally, respect for finality is required (PAII:325-26). In view of those express findings, there is no basis to conclude that a refusal to reopen the record on the issue of

Appellate Case: 15-2792    Page: 73    Date Filed: 12/11/2015 Entry ID: 4345711

damages was an abuse of discretion.[7/]   Further, plaintiffs can't claim prejudice from the district court's limitation on discovery upon remand because they never sought discovery relevant to this Court's measure of damages (PAII:326).

Plaintiffs' cases do not assist them.  *United States v. Bates*, 614 F.3d 490 (8th Cir. 2010), *United States v. Castellanos*, 608 F.3d 1010 (8th Cir. 2010) and *Level 3 Communications, L.L.C. v. City of St. Louis*, 540 F.3d 794 (8th Cir. 2008) each involved an appellate mandate like the one in this case.  *Bates* merely stated that the district court "could have heard" additional evidence, not that it was required to do so.  614 F.3d at 491-95.  *Castellanos* concluded that the lower court did *not* abuse its discretion by limiting the scope of its review.  608 F.3d at 1017. *Level 3* decided that the district court did not abuse its discretion in refusing to reopen discovery when there had been no change in the controlling legal standard and the existing record was "adequate."  Plaintiffs assert that the record here was inadequate "to decide the existing issue" (Pl.Br.52).  But plaintiffs had all the data they needed in order to submit proof of their alleged damages based on the existing

---

[7/]      Plaintiffs argued that the court should permit them to offer new evidence on damages but should prohibit ABB to permit additional proof on liability (PAI:159-66). There was no basis for that self-serving position.  The case was remanded on the issues of both liability and damages.  Thus, if the refusal to reopen the record were deemed to be an abuse of discretion, both sides would have the right to present additional evidence, and the district court would be required to consider ABB's evidence on the liability issue as set forth in its offer of proof (DA2:444-51).

record and the publicly-available information they offered through judicial notice (PAI:191-92, 240-43).

It is not "inefficient and [does not] place an unreasonable burden" on plaintiffs to require them to present all their damages evidence at one time rather than through successive trials (Pl.Br.55). To the contrary, the underlying purpose of the law of the case is to force parties to try their entire case at one time so that finality can be achieved. The real inefficiency would be to allow litigation to drag on every time a party thought of a new theory it had failed to raise before.

## CONCLUSION

For all the reasons stated, the judgment of the district court dated July 9, 2015 should be affirmed.

December 11, 2015                                      Respectfully submitted,

                                        /s/  *Thomas E. Wack*
                                        Thomas E. Wack
                                        Jeffrey S. Russell
                                        Elizabeth C. Carver
                                        211 North Broadway
                                        St. Louis, Missouri  63102
                                        (314) 259-2000

                                        *Attorneys for Defendants-Appellees*

Appellate Case: 15-2792     Page: 75     Date Filed: 12/11/2015 Entry ID: 4345711

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed.R.App.P. 32(a)(7)(B) because this brief contains 13,981 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 Times New Roman 14 point font.

3.      This brief has been scanned for viruses and is virus-free.

/s/  *Thomas E. Wack*
Attorney for Defendants-Appellees

Dated:  December 11, 2015

Appellate Case: 15-2792    Page: 76    Date Filed: 12/11/2015 Entry ID: 4345711

**CERTIFICATE OF SERVICE**

I certify that, on December 11, 2015, I electronically filed the foregoing with the Clerk for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/  *Thomas E. Wack*

Appellate Case: 15-2792     Page: 77     Date Filed: 12/11/2015 Entry ID: 4345711